CLARK SMITH VILLAZOR

Clark Smith Villazor LLP
666 Third Avenue, 21st Floor
New York, New York 10017
www.csvllp.com

BRIAN T. BURNS
D: 212.377.0855
brian.burns@csvllp.com

September 30, 2026

**VIA ECF**
The Honorable Jesse M. Furman
United States District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007

Re: *In re Application of Allan Green et al. for an Order to Take Discovery For Use in a Foreign Proceeding Under 28 U.S.C. § 1782*, 1:26-mc-00166-JMF (S.D.N.Y.)

Dear Judge Furman:

On behalf of the Silverpeak Parties, we oppose Applicants' September 28, 2026 letter-motion. (ECF 70 ("Sept. 28 Ltr").) The disputes Applicants raise stem not from any lack of diligence by the Silverpeak Parties, but principally from Applicants' insistence that the Silverpeak Parties review roughly 21,000 additional internal communications, despite the Court's instruction not to "be too greedy with the search terms." (Sept. 1, 2026 Conference Tr. ("Tr.") 22:2-6; *see id.* 28:20-24.) The Court should deny Applicants any relief. And since the Silverpeak Parties have agreed to review over 6,000 documents, the Court should extend the deadline for substantial completion of document production by two weeks, to October 16, 2026.

**A. The Silverpeak Parties Are Diligently Complying with the Court's Order**

Applicants mischaracterize the Silverpeak Parties' productions and ongoing review efforts. To date, the Silverpeak Parties have produced 216 documents totaling over 1,800 pages. The productions include an initial production on September 14 as agreed (ECF 62), with additional productions on September 15, 22, and 28. The September 28 production—of 188 documents—was made minutes after Applicants filed the Sept. 28 Letter, after we previously informed Applicants' counsel that we expected to make the production that day.

Applicants' complaint that internal communications have not yet been produced is premature; the review population has not even been finally determined and the Silverpeak Parties are still reviewing them. Applicants' complaint that executed transaction documents—like a put option agreement and an SPA—have not yet been produced is even more specious. At the September 1 conference, the Silverpeak Parties disclaimed any undertaking to produce all final agreements (which are between French companies, not the Silverpeak Parties) but agreed not to withhold them if they appeared in their review population. (Tr. 23:24-24:6.) Applicants were satisfied with that position then (*id.* at 24:7-12), but are now improperly seeking to re-trade it.

The Silverpeak Parties' review parameters are also reasonable. On September 9, the Silverpeak Parties sent proposed custodians and search terms yielding 2,687 documents, in two sets: first, for communications with ExxonMobil or its representatives (1,596 documents), and second, for internal Silverpeak communications (1,091 documents, and what Applicants refer to as "Set 1"). A full week later, Applicants sent a counterproposal. It yielded an additional 1,102 communications with ExxonMobil or its representatives, which the Silverpeak Parties agreed to

review. And it yielded over 21,000 additional documents in "Set 1," which the Silverpeak Parties did not agree to review.

After providing Applicants further search-term-level hit counts for their "Set 1" terms and getting revised terms from Applicants that did not meaningfully narrow the volume, the Silverpeak Parties proposed to review a still further 2,500 documents in "Set 1," to be determined by Applicants continuing to narrow their search parameters. With the other documents the Silverpeak Parties agreed to review, the total review population would be approximately 6,200 documents. Applicants did not offer a counterproposal and instead brought this motion. Meanwhile, the Silverpeak Parties continue to review the agreed documents.

**B. Applicants' Set 1 Population Is Disproportionate and Overbroad**

Applicants do not make clear what relief they seek as to "Set 1," nor do they provide the context (explained above) about the dispute. To the extent Applicants seek to force the review of the over 21,000 documents in their "Set 1" parameters, that effort should be rejected. The Court directed that internal communications be addressed through "reasonable agreed upon search terms and a defined set of custodians," and cautioned Applicants, "[d]on't be overly greedy on that front because it may bear on whether I revisit the internal communications issue…." (Tr. 17:13-18, 28:20-24.) Applicants appear unwilling to meaningfully narrow, as evidenced by their inclusion of search terms that relate to topics the Court agreed were beyond the Application's scope, namely the tender offer, squeeze-out, and independent expert (Tr. 6:21-25, 22:15-23:5): yet "tender offer" and related terms, "squeeze out," and "Independent expert" remain on Applicants' proposed list. Applicants' assurance that their terms do not "target excluded topics" (Sept. 28 Ltr at 2 n.3) cannot be squared with their own list. Nor is technology-assisted review ("TAR") a cure. TAR is properly used to review an appropriately large population, not to excuse expanded, overbroad requests beyond the Application's scope.

The Silverpeak Parties submit that the Court should adopt their proposal (*i.e.*, an additional 2,500 "Set 1" documents) or revisit the category entirely.[1] If the population is expanded, Applicants should bear the resulting cost, and the parties should brief cost-sharing.

**C. Applicants' Positions on Requests 1 and 5 Should be Rejected**

The Court should reject Applicants' position regarding "Request No. 1," because it is overbroad and is a backdoor to obtaining agreements involving Esso/NAE to which Applicants are not entitled. The subpoenas' original Request 1 sweepingly called for "[a]ll documents and communications relating to the Acquisition." (ECF 2-1 at 7.) The parties agreed to narrow it to documents regarding the share purchase agreement and other related agreements, but it should be further limited to those relating to price and value.[2] That limitation appropriately cabins this

[1] Applicants advocate for their outlandish review population by touting "high stakes" based on a misleading and irrelevant-in-time price differential. (Sept. 28 Ltr at 3.) As that argument is not relevant to the dispute here, the Silverpeak Parties reserve all rights as to that argument and others not addressed in this brief submission.
[2] Specifically, the Silverpeak Parties proposed the following limitation: such documents relating to any of "(i) the determination of the purchase price for the controlling stake in Esso; (ii) the relationship, if any, between that price and the acquisition of ExxonMobil Chemical; (iii) the structuring of the acquisitions of the controlling stake in Esso and ExxonMobil Chemical as linked or interdependent transactions; or (iv) the value of Esso, the controlling stake in Esso, or ExxonMobil Chemical."

extraordinarily broad request to the subjects relevant to the French proceeding.[3]

Applicants also cannot use Request 1 (or 2) as a backdoor to get information about Esso/NAE's agreements with ExxonMobil or its inventory financing arrangements with third parties (as Applicants know, the "withheld appendices" (Sept. 28 Ltr at 2) relate to these agreements). These are the operating company's agreements for its ongoing business; neither the Silverpeak Parties nor NAF are parties. Applicants' original Request 5 sought documents about such intra-group agreements only as "between or among ExxonMobil Chemical and ExxonMobil relating to the Acquisition." (ECF 2-1 at 7.) In negotiations, Applicants attempted to *expand* it to capture *any* agreements between Esso/NAE and ExxonMobil in connection with the acquisition and any financing arrangements. Now Applicants say they seek these agreements (and documents about their negotiation) not under Request 5, but under Requests 1 (or 2).

This attempt should be rejected. First, the original subpoenas—limited to such agreements between ExxonMobil Chemical and ExxonMobil—never fairly requested any other intra-group agreements. Second, the Texas federal courts already quashed Applicant Candel's attempt to obtain—*from Exxon*—"any agreement as to which the parties include Esso SAF and any other Person in the ExxonMobil Group." No. 4:24-mc-1948 (S.D. Tex.), ECF 12 at 24 (copy of subpoena); *see* ECF 36 at 20:5-18, *id.* at 27:19-28:4 (district court's oral ruling); *Candel & Partners SAS v. ExxonMobil Corp.*, No. 25-20366, 2026 WL 2126863, at *2 (5th Cir. July 23, 2026) (affirming and noting that the district court recognized "Candel's unsuccessful attempts to obtain the same information in the French proceedings"). Applicants should be estopped from obtaining this category of documents here. *See In re Rule 45 Subpoenas Issued to Google LLC & LinkedIn Corp. Dated July 23, 2020*, 337 F.R.D. 639, 648 (N.D. Cal. 2020) (collecting cases holding that a federal court order "on a discovery dispute is res judicata on that same issue" in another proceeding even if collateral estoppel does not apply to all aspects of the discovery dispute). Even absent formal estoppel, this Court should follow the Texas courts' rulings and not allow Applicants to obtain the same category of agreements from a non-party to those agreements. Third, the agreements contain trade secrets. Esso's French counsel attested, in a declaration NAE filed here, that they "include data that make it possible to understand components of [Esso's] trade margin," which "are not accessible on the market, either to customers or competitors," and meet each element of Article L.151-1 of the French Commercial Code. (ECF 37-1 ¶¶ 65-88.) Fourth, French courts have rejected another Esso minority shareholder's attempt to obtain other agreements between Esso and Exxon. (*See* ECF 37-1 ¶¶ 28-42.) And besides strained attempts to distinguish the Fifth Circuit and French rulings, Applicants provide no authority to support their right to obtain these agreements here.

Applicants thus are not entitled to Esso/NAE's agreements with ExxonMobil or its inventory financing arrangements with third parties. And because the agreements are not discoverable, communications about their negotiation should also be excluded.

The Court should deny Applicants relief, and extend the substantial production deadline by two weeks, from October 2 to October 16.

---

[3] Applicants' argument that this proposal renders Request 2 a "nullity" is facetious. As Applicants originally drafted it, Request 2 (calling for all communications "between or among" certain parties "relating to the Acquisition," ECF 2-1 at 7) was already just a subset of Request 1, and thus a nullity.

Respectfully submitted,

*/s/ Brian T. Burns*
Brian T. Burns

cc: All counsel of record (by ECF)

The Court agrees with the Silverpeak Parties on all issues, except that it declines to disturb the parties' agreement with respect to Request No. 1 by narrowing it further to documents "relating to price and value." Accordingly, Applicants' letter motion is GRANTED in part and DENIED in part. The Court reserves judgment on whether to grant an extension of the substantial completion deadline (and, if so, how long an extension) pending Applicants' response to the Silverpeak Parties' latest letter motion. See ECF Nos. 74-75.

The Clerk of Court is directed to terminate ECF No. 70.

SO ORDERED.

October 5, 2026